UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KENNY F. WISS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:12-cv-00204-NAB |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Kenny F. Wiss' ("Wiss") application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381. Wiss alleged disability due to schizophrenia, bipolar disorder, depression, high blood pressure, and a heart condition. (Tr. 183.) The parties consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1).

**I.     PROCEDURAL HISTORY**

Wiss applied for SSI on March 1, 2010. (Tr. 155-58.) Wiss alleged January 22, 2010 as the onset date of disability. (Tr. 155.) The Social Security Administration denied Wiss' SSI claim on May 27, 2010. (Tr. 103-107.) Wiss requested a hearing before Administrative Law Judge ("ALJ") Randolph E. Schum on June 24, 2010. (Tr. 111-112.) After the hearing, the ALJ issued a decision denying Wiss' SSI claim on February 16, 2011. (Tr. 13-27.) The Social Security Administration's Appeals Council denied Wiss' request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's decision to uphold the denial of benefits stands as the final decision of the Commissioner. (Tr. 1.) Wiss filed this appeal on February 6, 2012. [Doc. 1.]

1

Wiss a filed a Brief in Support of the Complaint on August 8, 2012. [Doc. 19.] The Commissioner filed a Brief in Support of the Answer. [Doc. 24.] Wiss filed a Reply Brief. [Doc. 25.]

## II.     ALJ DECISION

First, the ALJ found that Wiss had not engaged in substantial gainful activity since February 8, 2010. (Tr. 18.) Second, the ALJ found that Wiss had the severe impairments of obesity, bipolar disorder, and schizophrenia. (Tr. 18.) The ALJ determined that Wiss' other alleged impairments of back and knee problems, cardiac regurgitation, and breathing restriction were not severe because they were not supported by conclusive medical evidence and Wiss was not credible. (Tr. 18.)

Third, the ALJ found that Wiss did not have an impairment that met or equaled the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18.) Wiss' obesity was not equivalent to any listing because objective testing showed that Wiss was able to ambulate effectively. (Tr. 18-19.) Wiss mental impairments did not meet the criteria of listings 12.03 and 12.04 because Wiss had only mild to moderate difficulties in daily living, social functioning, concentration, persistence, and pace. (Tr. 19.) Wiss did not have repeated episodes of decompensation. (Tr. 19.)

Fourth, the ALJ determined that Wiss had the residual functional capacity ("RFC") to perform unskilled medium work that should not include constant/regular contact with the general public and that should not involve handling complaints from the general public. (Tr. 20.) The ALJ also determined that Wiss had the RFC to understand, remember, and carry out at least simple instructions and non-detailed tasks, adapt to routine/simple work changes, and respond appropriately to supervisors and coworkers in a task oriented setting where contact is casual and

infrequent.  (Tr. 20.)  The ALJ concluded that while Wiss cannot perform any of his past relevant work based on the RFC, there are jobs which exist in significant numbers in the national economy that Wiss can perform.  (Tr. 23.)  The ALJ finally concluded that Wiss has not been disabled within the meaning of the Social Security Act since February 8, 2010.  (Tr. 24.)

### III. ADMINISTRATIVE RECORD

#### A. Testimony before ALJ

ALJ Randolph E. Schum held a hearing on December 16, 2010.  (Tr. 28-42.)  Wiss and vocational expert Gerald Belchik, Ph.D., testified.  (Tr. 28.)  Wiss appeared with counsel.  (Tr. 28.)

#### 1. Claimant's Testimony

Wiss is forty-four years old and he had completed the ninth grade.  (Tr. 30.)  In previous employment from 1995 to 1997, Wiss performed waterproofing, foundation repair, and garage and driveway slab repair.  (Tr. 30.)  Wiss did not work from 1998 to 2001.  (Tr. 31.)  From 2002 to 2003, Wiss worked for Truck Centers, Inc. as a dispatcher.  (Tr. 31.)  For two weeks in 2006, Wiss was a dishwasher at the Cracker Barrel.  (Tr. 31.)  Wiss quit that job because he felt that he could not keep up with the pace and he had a hard time due to his knee slipping and wet floors.  (Tr. 31-32.)  The two week job at the Cracker Barrel was Wiss' last job.  (Tr. 32.)  Wiss has not worked in five years (Tr. 34.)

At the time of the hearing, Wiss weighed 245 pounds.  (Tr. 32.)  At his heaviest, Wiss weighed 340 pounds.  (Tr. 32.)  Wiss lost all of the weight in the past year by changing his diet and performing light exercises.  (Tr. 32.)  Wiss participated in a transitional employment program at the Independence Center.  (Tr. 34.)  He performed volunteer kitchen work at the

center, once or twice a week.  (Tr. 34.)  The kitchen work included cutting vegetables and browning meat.  (Tr. 35.)

Wiss was diagnosed with schizophrenia.  (Tr. 33.)  He heard voices and sounds during the night and sometimes during the day.  (Tr. 33.)  Wiss had trouble with sleeplessness because the voices and sounds woke him at night.  (Tr. 33.)  Wiss testified that hearing the voices during the day hurt his concentration.  (Tr. 36.)  The voices interfered with his concentration on most days, despite the medication he was taking for the voices.  (Tr. 36.)

Wiss drove himself to the hearing.  (Tr. 34)  Wiss performed chores at home, such as cleaning and laundry.  (Tr. 37.)  Wiss occasionally went to the grocery store.  (Tr. 37.)  Wiss testified that there were days in which he felt that he could not contribute to his household.  (Tr. 37.)  His mom has the money.  (Tr. 37.)  He watched television and read, though concentrating was difficult because of the voices.  (Tr. 38.)  Wiss used to fish, but has not done so in 12 years.  (Tr. 38.)

### 2. Vocational Expert Gerald Belchik's testimony

The ALJ asked Vocational Expert ("VE") Gerald Belchik whether a hypothetical claimant of Wiss' age, education, and work experience would be able to perform either Wiss' past work or other work, if that claimant has the ability to: (1)  perform a full range of medium work; (2)  understand, remember, and carry out at least simple instructions and non-detailed tasks; (3)  respond appropriately to supervisors and coworkers in a task-oriented setting where contact is casual and infrequent; (4) adapt to routine simple work changes; (5)  not have constant or regular contact with the general public; and (6) not perform work which includes more than infrequent handling of customer complaints.  (Tr. 38-39.)

VE Belchik testified that the claimant would not be able to perform any of Wiss' past work because his laborer work was at the heavy range and his dispatcher work required constant contact with the public. (Tr. 39.) VE Belchik testified that the claimant could work as a kitchen helper, similar to Wiss' volunteer kitchen work. (Tr. 39.) The kitchen helper job was unskilled and did not involve interacting directly with the public. (Tr. 39.) There were 2,300 jobs in the local economy and 100,000 in the national economy. (Tr. 39.) Assembly work, which can be performed at sedentary, light, and medium levels, was appropriate. (Tr. 39-40.) At the light level, there were 2,300 jobs in the local economy and 400,000 jobs in the national economy. (Tr. 40.) At the medium level, the claimant could be a warehouse worker. (Tr. 40.) There are 6,000 warehouse worker jobs in the local economy and 600,000 in the national economy. (Tr. 40.)

The ALJ then adjusted the hypothetical to a full range of light work, instead of medium work. (Tr. 40.) VE Belchik testified that the assembly job mentioned under the first hypothetical could still be performed. (Tr. 40.) An unskilled housekeeping job could be performed. (Tr. 40.) There were 6,500 jobs housekeeping jobs in the local economy and 500,000 in the national economy. (Tr. 40-41.)

VE Belchik testified that if the claimant missed more than one day a month secondary to psychosis, the claimant would not be able to perform any of Wiss' past work or any other position. (Tr. 41.) VE Belchik testified that if the claimant could not persist or focus for 25% of the workday outside of usual breaks, the claimant would not be able to perform any position. (Tr. 41-42.)

**B.    Medical Records**

In December 2007 and January 2008, Wiss was treated at the Saint Louis County Department of Health John C. Murphy Health Center for obesity. (Tr. 211-223.) On December

5

10, 2007, Wiss underwent a physical examination.  (Tr. 212.)  Wiss reported intermittent knee pain, but had no injuries.  (Tr. 212.)  Wiss weighed 348 pounds and his blood pressure was 130/90.  (Tr. 213.)  Dr. Shirley Marshall, M.D., found that Wiss had full range of motion in all joints, with normal strength and a normal gait.  (Tr. 214)  Wiss was prescribed Naprosyn for his knee pain.  (Tr. 214.)  Wiss was counseled about the importance of a healthy diet and exercise, including their relationship to knee pain.  (Tr. 214.)  Wiss' cholesterol levels were higher than the normal range.  (Tr. 220.)  On January 8, 2008, Wiss received counseling about a healthy diet, exercise, and meal preparation techniques.  (Tr. 211.)  Wiss reported sleeplessness and knee pain.  (Tr. 211.)  He received a medical clearance to exercise and was encouraged to do so for ten minutes per day.  (Tr. 223.)

From 2005-2009, Wiss received psychiatric treatment from Dr. Safwat Wahba at the Psych Care Consultants.  (Tr. 224-30.)  On September 28, 2005, Dr. Wahba noted that Wiss' symptoms improved with the prescribed Lamictal.  (Tr. 230.)  Dr. Wahba continued to prescribe Lexapro and Lamictal to Wiss through 2009.  (Tr. 210, 226-30.)  On March 7, 2006, Dr. Wahba diagnosed Wiss with bipolar disorder mixed and dependent disorder.  (Tr. 229.)  Wiss' Global Assessment of Function ("GAF") score was 75, with a noted past score of 50.  (Tr. 229.)  Wiss reported depression, mood swings, loss of temper, and anger problems.  (Tr. 229.)  Wiss' symptoms were more severe when he ran out of medication.  (Tr. 229.)  On May 23, 2006, Wiss reported depression and anger problems, but a decrease in mood swings.  (Tr. 228.)  Dr. Wahba noted that Wiss was not hearing voices and was not depressed or suicidal.  (Tr. 229.)  Wiss reported that his main problem was lack of employment and that he was actively seeking employment.  (Tr. 228.)  On September 12, 2006, Wiss saw Dr. Wahba at M. Javed Quasim Psychiatry.  (Tr. 210.)  Wiss was not depressed, suicidal, or manic.  (Tr. 210.)  Wiss was no

6

longer depressed, but was sad about not having a job. (Tr. 210.) On February 18, 2009, Wiss reported episodes of mania, depression, and mood swings. (Tr. 227.) On May 26, 2009, Wiss reported episodes of anger and moodiness. (Tr. 226.) Dr. Wahba noted that Wiss had poor functioning. (Tr. 226.) Dr. Wahba gave Wiss a GAF score of 55-60 and noted the diagnosis bipolar disorder. (Tr. 226.)

Wiss sought treatment from BJC Behavioral Health from 2006 to 2009. (Tr. 234-252.) The lowest GAF score that Wiss received from BJC was 50. (Tr. 244.) The most common GAF score that he received was 75. (Tr. 246, 249, 251.) Noted diagnoses were bipolar disorder, major depressive disorder, dependent personality disorder, and obesity. (Tr. 236, 242, 244, 245, 246, 249, 251.) Wiss expressed that his goals were losing weight and finding employment as soon as possible. (Tr. 246, 248.) Wiss also reported losing a past job because of a verbal altercation with his boss. (Tr. 243, 245.)

Wiss received out-patient treatment at Midwest Psychiatry from Dr. Dan Pugh, Dr. Daniel Mamah, and Laura Romer, A.P.R.N. in 2009. (Tr. 253-267.) Wiss routinely received a GAF score of 50 or 55. (Tr. 253, 254, 260, 263, 264.) During this time, Wiss took Lexapro, Lamictal, Wellbutrin, Trazodone, and Lamotrigine. (Tr. 253, 254, 256, 263, 264.) A pattern of losing jobs because of anger outbursts was noted. (Tr. 258.) Wiss exercised and lost weight in late 2009, despite initial difficulties with sustained walking. (Tr. 253, 254.) Wiss reported difficulty focusing and concentrating on written materials, but denied psychotic symptoms. (Tr. 259.) Wiss had poor abstract reasoning and performed poorly on a serial seven test.[1] (Tr. 260.) In December 2009, Wiss' mother reported to Dr. Pugh that Wiss had agitated conversations with people who were not present. (Tr. 266.) Wiss stated that he was not aware of hearing the voices.

---

[1] Serial seven tests are used to evaluate concentration by having the claimant subtract serial sevens from 100. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(3).

7

(Tr. 266.) Dr. Pugh noted that Wiss had "no apparent delusions" or no thoughts of harming himself or others. (Tr. 266.) Dr. Pugh determined that Wiss' condition was worsening and diagnosed Wiss with probable chronic undifferentiated schizophrenia. (Tr. 266.) Dr. Pugh assessed Wiss' GAF at 45 and added risperidone to Wiss' medications. (Tr. 266.)

Wiss continued treatment at Midwest Psychiatry in 2010 and in 2011, after the alleged onset date of disability. (Tr. 358-369.) On January 13, 2010, Dr. Pugh opined that Wiss was permanently and occupationally disabled by his improbable chronic undifferentiated schizophrenia, with mood symptoms. (Tr. 265.) In 2010 and 2011, Wiss was prescribed Invega, buproprion, trazodone, lamotrigine, risperidone, clonazepam, and Wellbutrin. (Tr. 358-369.) Wiss consistently had GAF scores between 45-50. (Tr. 358-360, 363, 365-367, 369.) Wiss had a GAF of 65-70 and 70 in July and August 2010. (Tr. 361-362.)

On February 12, 2010, Wiss' symptoms and side effects were improving. (Tr. 367.) On March 12, 2010, Wiss denied hearing voices but still heard "grumbling" that woke him at night. (Tr. 366.) On April 20, 2010, Wiss reported being "hectored" by mumbling voices. (Tr. 365.) The voices prevented Wiss from getting enough sleep, worsening his mood. (Tr. 365.) On May 7, 2010, Wiss reported that the grumbling still occurred at night and while reading. (Tr. 364.) Wiss attended his daughter's softball games and began taking G.E.D. classes. (Tr. 364.) Wiss was switched to Invega from risperidone. (Tr. 364.) On June 4, 2010, Wiss responded well to the Invega. (Tr. 363.) The mumbling decreased and Wiss was able to concentrate while working toward his G.E.D. (Tr. 363.) On July 1, 2010, Dr. Pugh noted that Wiss' symptoms had subsided, and gave GAF score of 70. (Tr. 362.) Wiss continued G.E.D. class, started computer classes, and was trying to find work. (Tr. 362.) On August 12, 2010, Wiss reported that his sleep was still disrupted. (Tr. 361.) Wiss continued his classes and started volunteering

8

at the Humane Society. (Tr. 361.) Wiss also reported that his energy level was up and down and he was depressed over his finances. (Tr. 361.)

On September 10, 2010, Wiss reported only hearing the voices at night. (Tr. 360.) On October 8, 2010, Wiss reported hearing the voices during the day and night, but was able to continue his employment meetings and GED classes. (Tr. 359.) Wiss also stated that he realized that back pain woke him at night, not the voices. (Tr. 359.) Wiss reported being frustrated about his progress. (Tr. 359.) On November 19, 2010, Wiss reported that adding pain medication at bedtime helped his sleep, but he still heard voices. (Tr. 358.) Wiss also reported being under stress because Medicaid, his only insurance, may end. (Tr. 358.) On January 7, 2011, Dr. Pugh concluded that Wiss was permanently and totally occupationally disabled by probable schizophrenia with "mood symptoms." (Tr. 369.)

At Metro Cardiovascular, Inc. in 2009 and 2010, Dr. Jawed Siddiqui treated Wiss for prediabetes, congestive heart failure, and high blood pressure, and a licensed dietician extensively counseled Wiss about diet and exercise. (Tr. 270-294, 328-356.) Wiss changed his eating habits and reported exercising 30 minutes daily. (Tr. 270.) Stress tests on September 1, 2009 and on April 22, 2010 showed normal blood pressure and fair exercise capacity. (Tr. 287, 345.) Cardiac/color flow Doppler studies on September 1, 2009 and April 13, 2010 showed mild valve regurgitations in Wiss' heart. (Tr. 291, 347.)

Abby Mobley, a state agency consultant completed physical RFC assessment on April 6, 2010. Mobley determined that Wiss had exertional, postural, and environmental limitations, but no manipulative, visual, or communicative limitations. (Tr. 297-299.) Mobley found Wiss' allegations of pain and limitations were partially credible. (Tr. 300.) Mobley determined that

Wiss had no problem taking care of personal needs, had some difficulty getting along with others-including authority figures, and some difficulty with physical activities.

Dr. John Rabun at the West Park Medical Clinic evaluated Wiss on April 26, 2010.  (Tr. 304-06.)  Wiss reported hearing voices as though they were "outside" his head, commenting on his thoughts and discussing his actions amongst themselves.  (Tr. 304.)  Wiss reported some delusional thoughts as well.  (Tr. 304.)  Dr. Rabun noted that Wiss did not show signs of depression.  (Tr. 305.)  Wiss was able to focus and concentrate.  (Tr. 305.)  Wiss was alert and oriented while successfully completing memory tasks, even with five minutes of distraction.  (Tr. 305.)  Dr. Rabun concluded that Wiss had the capacity to focus, concentrate, and remember instructions.  (Tr. 305.)  Dr. Rabun also concluded that an exaggeration of his psychotic experiences would likely disrupt Wiss' focus and concentration.  (Tr. 305.)  Wiss' intellectual capacity was judged to be in the low average range.  (Tr. 305.)  Dr. Rabun gave Wiss a GAF score of 50.  (Tr. 305.)  Dr. Rabun diagnosed Wiss with schizophrenia, undifferentiated type.  (Tr. 305.)

Phillip Rosenshield, Ph.D. conducted a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment about Wiss on May 25, 2010.  (Tr. 313-327.)  Dr. Rosenshield also found that Wiss had chronic undifferentiated schizophrenia and bipolar affective disorder.  (Tr. 315-316.)  Dr. Rosenshield noted mild limitations in daily living and in concentration, persistence, or pace, and moderate limitations in social functioning.  (Tr. 321.)  Wiss did not have repeated episodes of decompensation.  (Tr. 321.)

Dr. Rosenshield found that Wiss was moderately limited in his ability to: understand and remember detailed instructions, carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general

10

public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 325-26.) Dr. Rosenshield concluded that Wiss was capable of concentrating sufficiently well to implement work tasks in a timely manner without special supervision and to adapt to changes in the work setting. (Tr. 327.) Dr. Rosenshield also opined that Wiss was capable of maintaining superficially appropriate interactions with co-workers, supervisors, and the general public, and work best in situations that required minimal social interaction. (Tr. 327.)

## IV.   LEGAL STANDARD

The ALJ's decision is affirmed if it is "supported by the substantial evidence on the record as a whole." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). Evidence that both supports and detracts from the ALJ's decision will be considered. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). The ALJ's decision, however, will not be reversed merely because some evidence may support a different conclusion. *Id.* If the evidence supports two inconsistent decisions, one of which represents the ALJ's findings, the ALJ's decision will be affirmed. *Id.* at 897-98. A denial of benefits must be affirmed if there is substantial evidence to support it, even if this Court would have weighed the evidence differently. *Charles v. Barnhart*, 375 F.3d 777, 782-83 (8th Cir. 2004).

The definition of disability for social security purposes is the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 416.905(a). If a claimant is able to do substantial gainful work in that exists in the national economy, the claimant is not disabled. *Id.* The claimant has the burden to establish entitlement to social security benefits.

*Fastner v. Barnhart*, 324 F.3d 981, 983 (8th Cir. 2003) (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir.1995)).

To determine whether the claimant is disabled, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. § 416.920(a)(1). At step one, the Commissioner determines whether the claimant is engaging substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If the claimant is engaging in substantial gainful activity, the claimant is not disabled. *Id.*

At step two, the Commissioner determines whether the claimant has a severe medically determinable physical or mental impairment that meets the duration requirement. 20 C.F.R. § 416.920(a)(4)(ii). To meet the duration requirement, the severe medical impairment must result in death, or it must have lasted or must be expected to last for a continuous period of at least 12 months. 20 CFR § 416.909. If the duration requirement is not met, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(ii).

At step three, the Commissioner determines the medical severity of the claimant's impairment. 20 C.F.R. § 416.920(a)(iii). If the impairment meets or exceeds an impairment in 202 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is disabled. *Id.*

At step four, the Commissioner determines whether the claimant can still perform past relevant work. 20 C.F.R. § 416.920(a)(iv). If the claimant can still perform past relevant work, the claimant is not disabled. *Id.*

At step five, the Commissioner determines whether the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). The Commissioner considers the assessment of the claimant's residual functional capacity and the claimant's age, education, and work experience. *Id.* If the claimant is able to make adjustments to other work, the claimant is not disabled. *Id.*

## V.     DISCUSSION

Wiss alleges three points of error on appeal: (A) the ALJ failed to properly evaluate Dr. Pugh's medical opinion or re-contact Dr. Pugh for clarification; (B) the ALJ failed to properly discuss or evaluate the opinions of Dr. Rabun and Dr. Rosenshield; and (C) the ALJ failed to consider the effects of Wiss' episodic hallucinations on Wiss' concentration and focus.  [Doc. 19.]

### A.     Dr. Pugh's opinion

Wiss alleges that the ALJ failed to consider the factors required under 20 C.F.R. § 416.927 to evaluate the medical opinion of Dr. Pugh. [Doc. 19.]  The ALJ found that Dr. Pugh's low GAF scores were not supported by Dr. Pugh's observations and not consistent with disabling symptoms.  (Tr. 21.)  The ALJ also found that Dr. Pugh's GAF scores were not consistent with higher GAF scores by Dr. Pugh's associate at Midwest Psychiatry during the same time period. (Tr. 22.)  The ALJ also noted that Dr. Pugh's assessment was not consistent with Wiss' ability to engage in several daily activities, such as participating in a transitional employment program, doing food preparation work in a volunteer kitchen, taking a GED course, volunteering for the Humane Society, and taking computer classes at the library.  (Tr. 21.)  The ALJ did not expressly discuss the treatment relationship between Dr. Pugh and Wiss, but the ALJ's in depth discussion of Dr. Pugh's treatment notes shows that the ALJ knew and considered the treatment relationship.  The Court finds that the ALJ considered the factors required under 20 C.F.R. § 416.927 and did not err.

Wiss also alleges that the ALJ had a duty to recontact Dr. Pugh for clarification about his opinion, because the ALJ "admitted he could not ascertain the link between Dr. Pugh's opinions and Dr. Pugh's medical findings."  [Doc. 19.]  The ALJ is not required to contact a treating

13

physician whenever the ALJ rejects that opinion. *See Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir.2006). The ALJ is not required "to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010) (quoting *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). Lack of medical evidence to support a certain doctor's opinion does not constitute an undeveloped issue. *Martise v. Astrue,* 641 F.3d 909, 927 (8th Cir. 2011). The administrative record contained ample medical records and opinions for the ALJ to consider, including many from Dr. Pugh personally. (Tr. 265-267, 358, 360, 363, 365, 367, 369.) The ALJ did not express confusion or uncertainty about a link between Dr. Pugh's opinion and medical findings. Instead, the ALJ explicitly found that Dr. Pugh's opinions were "not supported by his own allegations," inconsistent with disabling symptoms, and inconsistent with scoring by his associate during the same time period. (Tr. 21-22.) Furthermore, Dr. Pugh's opinion that Wiss was disabled did not warrant any deference. *Perkins v. Astrue*, 648 F.3d 892, 898 (8th Cir. 2011) ("a treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference"). The ALJ did not err by discounting Dr. Pugh's opinion because it was unsupported and inconsistent with other substantial evidence. *Goff v. Barnhart*, 421 F.3d 785, 790-91 (8th Cir. 2005).

Wiss also alleges that "the ALJ provided a recitation which was not entirely accurate when discussing Dr. Pugh's treatment notes." [Doc. 19.] Wiss is correct that there are factual inconsistencies. For example, the ALJ states that "there is no indication that the claimant hears voices during the day or that he hears voices while trying to work." (Tr. 21.) Wiss twice reported hearing voices during the day and while attempting to read. (Tr. 359, 364.) More often, however, Wiss reported that he heard auditory hallucinations at night. (Tr. 360, 361, 362, 363, 366.) There is no indication that the ALJ would have decided differently based on the daytime

14

auditory hallucinations intermittently reported to Dr. Pugh, especially in light of the weight given to Dr. Pugh's medical opinion and Wiss' credibility. The ALJ's factual error was harmless and does not warrant remand. *Renstrom v. Astrue*, 680 F.3d 1057, 1068 (8th Cir. 2012) (citing *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008)).

### B. Dr. Rabun and Dr. Rosenshield's opinions

Wiss alleges that the ALJ failed to evaluate the opinion of examining expert Dr. Rabun. [Doc. 19.] Wiss further alleges that the ALJ made no mention of Dr. Rabun's report in his decision. [Doc. 19.] "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Wildman v. Astrue*, 596 F.3d 959, 966 (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). "[A]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* The ALJ's decision not to discuss Dr. Rabun's medical opinion is not a failure to consider Dr. Rabun's opinion. Moreover, the ALJ did not fail to mention Dr. Rabun's report. The ALJ cited Dr. Rabun's report to a support a finding that Wiss' symptoms were not severe. (Tr. 21.) The ALJ did not err because while he was required to consider all the evidence, he was not required to discuss all the evidence in his written decision.

Wiss alleges that the ALJ failed to explain why the opinion of state agency consultant Dr. Rosenshield was given significant weight. [Doc. 19.] Relying on a state agency consultant's opinion without explaining the weight given to the opinion is grounds for remand. *See Willcockson v. Astrue*, 540 F.3d 878, 880-81 (8th Cir. 2008) (remanding because ALJ implicitly relied on state agency report without explaining weight given to report). When giving Dr. Rosenshield's opinion substantial weight, the ALJ stated:

> Dr. Rosenshield's assessment is generally consistent with the claimant's typical daily activities and the severity of the symptoms typically observed by the

15

> claimant's healthcare providers. For these reasons his assessment deserves significant weight. (Tr. 22.)

Unlike the ALJ in *Willcockson*, the ALJ explained the weight given to Dr. Rosenshield's opinion. The ALJ stated that he gave significant weight to the opinion because it was consistent with a record as a whole. The ALJ is required to consider consistency when weighing medical opinions, therefore consistency was an appropriate basis for the ALJ's decision to give Dr. Rosenshield's opinion significant weight. 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"). The ALJ had the authority to grant more weight to a medical opinion that was consistent with the substantial evidence on the record as a whole. *Goff*, 421 F.3d at 790-91.

### C.     Wiss' auditory hallucinations and concentration

Wiss alleges that the ALJ committed an error by not including Wiss' "episodic inability to concentrate and focus" caused by auditory hallucinations in Wiss' RFC assessment or in the hypothetical question to the vocational experts. [Doc. 19.] Wiss alleges that the vocational expert testimony is not substantial evidence because of the ALJ's omission. [Doc. 19.] "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true." *Perkins v. Astrue,* 648 F.3d 892, 901-02 (8th Cir. 2011) (quoting *Goff,* 421 F.3d at 794). The ALJ did not err by excluding impairments that he found unsupported by the record. *Id*. The ALJ excluded Wiss' subjective descriptions of his concentration and focus because Wiss' allegation of disability was inconsistent with his ability to engage in a wide variety of daily activities, including GED studying, computer classes, parenting his children, and volunteer food preparation work. (Tr. 21.) The ALJ placed more weight on objective medical evidence and found that Wiss only had mild difficulties with concentration. (Tr. 19, 21.) The ALJ's finding was consistent with

16

medical records that indicated Wiss' ability to concentrate was controlled by medication. (Tr. 362, 363.) The ALJ's finding was also consistent with the medical opinion of Dr. Rosenshield. (Tr. 325.) Moreover, Wiss' volunteer food preparation work mirrors the description of the "kitchen helper" job discussed by the vocational expert in response to the ALJ's question. (Tr. 24, 39.) The ALJ included all accepted and supported limitations in his question to the vocational expert and in the RFC, therefore he did not commit a reversible error.

## VI.  CONCLUSION

For the reasons set forth above, the undersigned finds that substantial evidence on the record as a whole supports the Commissioner's decision that Wiss is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief which Wiss seeks in his Complaint and Brief in Support of the Complaint is **DENIED**.  [Docs. 1, 19.]


Dated this 28th day of March, 2013.

                                                   /s/ Nannette A. Baker
                                             NANNETTE A. BAKER,
                                             UNITED STATES MAGISTRATE JUDGE